**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

BRIAN KIRK MALPASSO, *et al.*,    )
    )
       *Plaintiffs*,    )
    )  Civil Action No. 18-cv-1064
    v.    )
    )  Judge Marvin J. Garbis
WILLIAM M. PALLOZZI,    )
    )
       *Defendant*.    )

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Nicole J. Moss, Bar No. 20222
*Attorney of Record*
David H. Thompson*
Peter A. Patterson*
John D. Ohlendorf*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
nmoss@cooperkirk.com

*Appearing *pro hac vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................1

STATEMENT ..............................................................................................................2

I.      Maryland's "good and substantial reason" requirement .....................................2

II.     Defendant's refusal to issue handgun carry permits to Plaintiffs .......................3

ARGUMENT ...............................................................................................................4

I.      The conduct restricted by Maryland's "good and substantial reason" requirement
        lies at the core of the Second Amendment..........................................................5

        A.      Text, history, precedent, and purpose all confirm that the right to keep and
                bear arms extends outside the home. ......................................................5

        B.      *Woollard* erred in concluding that the right to carry firearms outside the
                home is not at the core of the Second Amendment. ................................14

II.     Under *Heller*, Defendant's requirement that law-abiding citizens demonstrate a
        special need for self-defense to exercise their Second Amendment rights is
        categorically unconstitutional. ...........................................................................17

III.    *Woollard* was wrong to uphold Defendant's "good and substantial reason" restriction
        under intermediate scrutiny................................................................................19

        A.      Strict scrutiny should apply. ..................................................................19

        B.      Defendant's "good and substantial reason" restriction fails even intermediate
                scrutiny, properly applied. .....................................................................19

CONCLUSION...........................................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                                                                     **Page**

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) .......................................................8

*Aymette v. State*, 21 Tenn. 154 (1840) ...............................................................15, 16

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822).............................................10, 15

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).....................................18

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ......................................................6

*Carcano v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) .........................................4

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)...............................20

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).....................................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..................1, 5, 6, 7, 9, 10, 12, 14, 16, 17, 18

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ..............................................................27

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857).............................................13

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ......18

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).......................................18

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ...........................19, 20, 21, 27

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015).................20

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) ...............................15

*Lucero v. Early*, 873 F.3d 466 (4th Cir. 2017) ............................................................4

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) .......................................................26, 27

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..............................8, 13, 14, 17, 19

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).......................................5, 6, 7, 16, 21

*New York Times Co. v. United States*, 403 U.S. 713 (1971).........................................18

*Nunn v. State*, 1 Ga. 243 (1846).........................................................................10, 15, 16

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)....................................8

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...................................10

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)...............................................................8

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..................................19

*Scherr v. Handgun Permit Review Bd.*, 880 A.2d 1137 (Md. Ct. Spec. App. 2005)...........1, 3, 17

*Simpson v. State*, 13 Tenn. 356 (1833) .....................................................................11

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ................................................10

*Snowden v. Handgun Permit Review Bd.*, 413 A.2d 295 (Md. Ct. Spec. App. 1980)....................3

*State v. Chandler*, 5 La. Ann. 489 (1850) ...................................................................15

*State v. Huntly*, 25 N.C. 418 (1843) .........................................................................11

*State v. Reid*, 1 Ala. 612 (1840) ........................................................................10, 15

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..............................................22

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ...............................................5

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) .........................14, 15, 16

*United States v. Virginia*, 518 U.S. 515 (1996) .........................................................21

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) .................................25

*Wikimedia Found. v. National Sec. Agency*, 857 F.3d 193 (4th Cir. 2017) ...................4

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .............................1, 6, 14, 20, 22

*Wrenn v. District of Columbia*,
     864 F.3d 650 (D.C. Cir. 2017) .....................................6, 12, 14, 15, 16, 18, 19, 20, 21

**Constitutional and Statutory Provisions, Regulations, and Legislative Materials**

U.S. CONST. amend. II ...............................................................................................1, 5

MD. CODE CRIM. LAW

    § 4-203(a)(1) .........................................................................................................2

    § 4-203(b)(2) .........................................................................................................2

MD. CODE PUB. SAFETY

    § 5-303 ...................................................................................................................2

    § 5-305 ...................................................................................................................2

    § 5-306(a) ...............................................................................................................2

    § 5-306(a)(5) ..........................................................................................................2

    § 5-306(a)(6)(i) ......................................................................................................2

    § 5-306(a)(6)(ii) .................................................................................................1, 3

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ...............................................12, 13

1836 Mass. Laws 748, ch. 134, § 16 .......................................................................11, 12

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1,
     1865 Miss. Laws 165 .............................................................................................13

2 Edw. 3, 258, c. 3 (1328) ..........................................................................................10

MD. CODE REGS. 29.03.02.03 ......................................................................................18

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy) ...13, 14

## Other

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE (Hazeltine et al. eds., 1905) .........................................................................9,10

Abhay Aneja, John J. Donohue III, & Alexandria Zhang, The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H......................23

4 WILLIAM BLACKSTONE, COMMENTARIES ......................................................................8, 11, 12

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803)....................................9

*Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE (1785) .....................................................................8, 9

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES (2010), http://goo.gl/6NAuIB...................................................................7

Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041 (2009) ..........................21

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991) ...........................................................13

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893).............................................9

John J. Donohue et al., Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data, the Lasso, and a State-Level Synthetic Controls Analysis (Nat'l Bureau of Econ. Res., Working Paper No. 23510, 2017) (unpublished manuscript) ...................23, 24

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906) ..........................13

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40 (2005) ..............................................................................22

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986)...................................................25, 26

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ................................8, 11

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822)...............................................................................................................................11

1 THE WORKS OF THOMAS JEFFERSON (letter of Aug. 19, 1785) (H. A. Washington ed., 1884).....................................................................................................9

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012)..................................................................................................................9

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)..........................................26

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998) ..............................26

WILLIAM LAMBARD, EIRENARCHA (1588) ...................................................................................11

*Firearms*, MONTICELLO, https://goo.gl/W6FSpM ..........................................................................9

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY (Jens Ludwig & Philip J. Cook eds., 2003) ...............................................................................................................................21

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005) ..............................22, 26

*Gun Laws*, NRA-ILA, https://goo.gl/Nggx50 .............................................................................21

Michael Siegel, et. al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017) ...........................................25

HARLOW GILES UNGER, LION OF LIBERTY (2010) .......................................................................10

Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed to Keep Firearms from High-Risk Individuals*, 36 ANN. REV. PUB. HEALTH 21 (2015), *available at* https://goo.gl/mULNvz ..............................................................................................................24, 25

Webster, et al., Firearms on College Campuses (Oct. 15, 2016) (unpublished manuscript), *available at* https://goo.gl/RN6zec ........................................................................................24

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) ...............................11

## INTRODUCTION

At the core of the Second Amendment lies "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). When the people elevated that right into the Nation's fundamental charter, they did not intend to leave the freedom to exercise it at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.

The State of Maryland has imposed limits on "the right of the people to . . . bear Arms," U.S. CONST. amend. II, that flout these basic constitutional principles at every turn. Maryland has seized the very power forbidden it by the Second Amendment: the power to decide, on a case-by-case basis, whether an applicant for a permit to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, has, in the estimation of its licensing authorities, shown a sufficiently "good and substantial reason" to exercise that right, MD. CODE PUB. SAFETY § 5-306(a)(6)(ii). Worse still, the State has determined that a general desire to carry a weapon for self-defense is not a sufficiently good reason—demanding, instead, *documented evidence* of *concrete threats* or recent assaults, that set the applicant apart from the "average person." *Scherr v. Handgun Permit Review Bd.*, 880 A.2d 1137, 1148 (Md. Ct. Spec. App. 2005). Maryland has thus struck a balance *directly contrary* to the Constitution's demand that the right to self-defense—"the *central component*" of the Second Amendment, *Heller*, 554 U.S. at 599—must be "elevate[d] above all other interests." *Id.* at 635.

To be sure, as Maryland points out, the Fourth Circuit—in precedent we concede is binding on this Court at this stage in the litigation—has upheld Maryland's "good and substantial reason" limit. *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013). But *Woollard* is deeply flawed, and it

should be overturned at the first opportunity by a court competent to do so. *Woollard* does not meaningfully acknowledge the extensive textual and historical evidence demonstrating that the right to carry firearms for self-protection outside the home is at the very core of the Second Amendment. It adopts merely "intermediate" constitutional scrutiny, effectively relegating the right to bear arms to second-class status. And even if the choice of intermediate scrutiny were defensible, *Woollard*'s application of it—essentially deferring to the State's judgment without discussing or even *identifying* the empirical evidence on which that judgment was supposedly based—is not.

In sum, although this Court is presently bound by Fourth Circuit precedent to uphold it, Maryland's "good and substantial reason" restriction is unconstitutional.

## STATEMENT

### I.    Maryland's "good and substantial reason" requirement

Under Maryland law, an ordinary member of the general public who wishes to "wear, carry, or transport a handgun" in public, "whether concealed or open," must first obtain a permit to do so (a "Handgun Carry Permit") from the Maryland Secretary of State Police, Defendant Pallozzi. MD. CODE CRIM. LAW § 4-203(a)(1), (b)(2); *see also* MD. CODE PUB. SAFETY § 5-303. Maryland imposes a number of objective restrictions on the eligibility for a Handgun Carry Permit. For example, an applicant must be an adult, must not have been convicted of any felony or any misdemeanor involving controlled substances, and must not be an alcoholic or addicted to any controlled substance. MD. CODE PUB. SAFETY § 5-306(a). An applicant must also pass a background check, *id.* § 5-305, must satisfy the Secretary, after investigation, that the applicant "has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another," *id.* § 5-306(a)(6)(i), and must have completed an extensive firearms safety training course, *id.* § 5-306(a)(5).

In addition to these eligibility requirements, Maryland law also imposes a more subjective restriction on the availability of Handgun Carry Permits: an applicant must demonstrate that he or she "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." *Id.* § 5-306(a)(6)(ii). Secretary Pallozzi has issued regulations and guidance further fleshing out this standard, clarifying that an applicant seeking a permit for "[p]ersonal [p]rotection" must provide "documented evidence of recent threats, robberies, and/or assaults, supported by official police reports or notarized statements from witnesses." *See* Complaint for Declaratory and Injunctive Relief ¶ 18 & Ex. 1 (Apr. 12, 2018), Doc. 1 ("Compl."). And Maryland state courts have decided that living in a high-crime neighborhood or being subject to "vague threat[s]" are *not* sufficient "good and substantial reasons" to obtain a permit—since if they were, "[e]ach person *could decide for himself or herself* that he or she was in danger." *Snowden v. Handgun Permit Review Bd.*, 413 A.2d 295, 298 (Md. Ct. Spec. App. 1980) (emphasis added). Instead, an applicant must generally provide evidence of a concrete risk that sets him or her apart from "an average person" who would like to carry a firearm because she "lives in a dangerous society." *Scherr*, 880 A.2d at 1148.

Accordingly, typical Maryland citizens—the vast majority of citizens who cannot provide "documented evidence of recent threats," Compl. Ex. 1 at 2, that set them apart from the "average person," *Scherr*, 880 A.2d at 1148—effectively remain subject to a ban on carrying handguns outside the home for self-defense.

## II.     Defendant's refusal to issue handgun carry permits to Plaintiffs

Pursuant to this restriction, Defendant denied a request by Plaintiff Malpasso for a Handgun Carry Permit that would allow him to carry a handgun in public for self-defense. Mr. Malpasso applied to Defendant Pallozzi for a permit to carry a handgun in public on January 7, 2018. Compl. ¶ 23. Secretary Pallozzi did not determine that Mr. Malpasso failed to meet any of

the eligibility or training requirements imposed by Maryland law, but he nonetheless denied the application because he concluded that Mr. Malpasso has no "good and substantial reason" to carry a handgun in public, because he did not provide evidence of any concrete, present fear for his safety, such as harassment, stalking, or documented threats of violence. *See* Compl. ¶ 24, Ex. 3 at 1.[1]

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017) (quotation marks omitted). The Court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. National Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

As Defendant points out, the Fourth Circuit held in *Woollard* that Maryland's "good and substantial reason" restriction on the issuance of Handgun Carry Permits is consistent with the Second Amendment. Because this Court is "bound to follow circuit precedent," *Carcano v. McCrory*, 203 F. Supp. 3d 615, 637 (M.D.N.C. 2016), Plaintiffs do not dispute that it must follow the controlling decision in *Woollard*, at this point in the proceedings. But *Woollard*'s ruling is deeply flawed, and as we show below, it should be overruled at the first opportunity by a court with authority to do so.

---

[1] Defendant has also refused, on the basis of the "good and substantial reason" requirement, to grant at least one member of organizational plaintiff Maryland State Rifle and Pistol Association a permit that would allow the carrying of a firearm outside the home for self-defense. *Id.* ¶ 26.

**I.     The conduct restricted by Maryland's "good and substantial reason" requirement lies at the core of the Second Amendment.**

    **A.     Text, history, precedent, and purpose all confirm that the right to keep and bear arms extends outside the home.**

In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. And although that landmark ruling did not purport to "clarify the entire field" of Second Amendment jurisprudence, *id.* at 635, *Heller* did set forth clear guidance about *the methodology* for deciding future disputes over the right to keep and bear arms. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 634–35, deciding whether a government restriction challenged on Second Amendment grounds can be squared with that provision involves close "textual analysis" and "historical inquiry." *United States v. Chester*, 628 F.3d 673, 675, 680 (4th Cir. 2010). Here, text, precedent, purpose, and history uniformly show that the carrying of firearms outside the home for self-defense is squarely protected by the Second Amendment right.

    1.     The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms, standing alone, would be sufficient to protect the right to have arms in the home.

2.      Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Id.* at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alterations in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise, there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

While the Fourth Circuit has not squarely addressed whether the Second Amendment applies outside the home, *Woollard* "assume[d] that the *Heller* right exists outside the home." 712 F.3d at 876. That assumption is consistent with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right to armed self-defense does not give out at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942. And *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

3.     The very purposes behind the Second Amendment's codification show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public, they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms only within their homes. And the same reasoning applies with even more force to the "the *central component*" of the Second Amendment right: self-defense. *Id.* There is nothing in *Heller*'s language to suggest that this core purpose may only be pursued in the home. Nor is there any such suggestion in the Amendment's text. And "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Id.* at 942. Indeed, according to the latest nationwide data from the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage.[2] Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

---

[2] BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), http://goo.gl/6NAuIB.

4.    Finally, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home.

As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716).

Because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, the Recorder of London—a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—opined that "the right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable," *Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59 (1785). These "lawful purposes, for which arms may be used," were not limited to the home, for they included "immediate self-defence, . . . suppression of violent and

felonious breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id.* at 63.

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, it necessarily conferred a corresponding right to do so. And that understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, MONTICELLO, https://goo.gl/W6FSpM. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants [of Boston] had a right to arm themselves at that time for their defence." John Adams,

*First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010). This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, in the pre-history of the Second Amendment, the medieval Statute of Northampton provided that "no man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). But contrary to amicus Everytown for Gun Safety's revisionist version of history, Northampton—and the analogues adopted on this side of the Atlantic—did not "broadly prohibit[ ] public carry in populated places." Brief of Everytown for Gun Safety as Amicus Curiae in Support of Defendant at 7 (June 15, 2018), Doc. 16 ("Everytown Amicus"). To the contrary, by the seventeenth century the courts and commentators had conclusively interpreted the provision as limited to "prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And this

rule against "*riding* or *going armed*, with dangerous or unusual weapons" and thereby "terrifying the good people of the land," 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49, was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136.

Early American courts and commentators shared this understanding of the scope of the right to bear arms in self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

Everytown also relies on the "surety" type laws enacted beginning in the 1830s. Everytown Amicus 11–12. These laws required any person who bore arms in public to post a deposit or "surety" "for keeping the peace" upon complaint of "any person having reasonable cause to fear an injury, or breach of the peace," unless he himself could show that he had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. But these laws likewise fail to support Everytown's understanding of the Second Amendment's scope. To begin, these laws were triggered only when some person who reasonably felt threatened lodged a complaint. 1836 Mass. Laws 750. Moreover, even if there

was a complaint, the individual in question could nonetheless *continue to carry his firearm*, so long as he posted a surety designed to cover the potential costs of any breach of the peace. *Id.* These laws were also accompanied by a safe-harbor provision for anyone carrying a firearm because of "reasonable cause to fear an assault or other injury" to himself, his family, or his property. Taken together, these surety-style laws simply "did not deny a responsible person carrying rights unless he showed a special need for self-defense." *Wrenn*, 864 F.3d at 661.

Everytown insists that these laws involved "a form of criminal punishment" and were placed in the criminal section of the Code. Everytown Amicus 11 n.5. But the historical evidence makes clear that these types of restrictions were not viewed as "broadly restrict[ing] public carry." *Id.* at 12. As Blackstone explained, a law requiring the posting of a surety to keep the peace was "intended merely for prevention" in circumstances where there was "a probable suspicion, that some crime is intended or likely to happen; and consequently *it is not meant as any degree of punishment*, unless perhaps for a man's imprudence in giving just ground of apprehension." 4 WILLIAM BLACKSTONE, COMMENTARIES *249 (emphasis added).

The understanding that the Second Amendment protected a robust right to carry firearms outside the home persisted throughout the nineteenth century. Reconstruction Era views are "instructive" evidence of the Second Amendment's scope because they reflect "*the public understanding* of [the Amendment] in the period after its enactment." *Heller*, 554 U.S. at 605, 614. And those who wrote and ratified the Fourteenth Amendment clearly understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States had schemed at every turn to prevent their enslaved and free black populations from bearing arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol,"

unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Parallel restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. And in an ordinance strikingly similar in operation to Maryland's "good and substantial reason" law, several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906).

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his

homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

### B. *Woollard* erred in concluding that the right to carry firearms outside the home is not at the core of the Second Amendment.

The right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is not only within the scope of the Second Amendment, it lies at the very core of that guarantee. *Heller* makes clear that the right to individual self-defense is "the *central component*" of the Second Amendment. *Id.* at 599. Given that the Second Amendment's text, history, and purposes all show that its protections extend outside the home, the right to carry firearms "for the core lawful purpose of self-defense" necessarily extends beyond those four walls as well. *Id.* at 630. "Thus, the Amendment's core generally covers carrying in public for self-defense." *Wrenn*, 864 F.3d at 659.

*Woollard* disagreed with this proposition, based on the Fourth Circuit's earlier conclusion in *United States v. Masciandaro* that the Second Amendment right is "more limited" in public than within the home, and that restrictions on carrying arms outside the home are thus subject to only intermediate scrutiny. 638 F.3d 458, 470–71 (4th Cir. 2011). That reasoning fails for multiple reasons. To begin, because both *Masciandaro* and *Woollard* explicitly declined to conduct any meaningful textual and historical analysis of whether the Second Amendment applies outside the home, *id.* at 474 (opinion of Wilkinson, J.), the Fourth Circuit had little basis for concluding that the right to bear arms outside the home falls outside the core of the Second Amendment. While the Fourth Circuit's decision to "assume that the *Heller* right exists outside the home," *Woollard*, 712 F.3d at 876, may have been "meant to be generous to the plaintiffs, by granting a premise in their favor," its effect was to sweep under the rug the overwhelming historical and textual support, discussed above, for the conclusion that the right to bear arms in public lies at the very heart of the Second Amendment, *Wrenn*, 864 F.3d at 663.

14

Instead of grappling with the historical evidence discussed above, *Masciandaro* merely asserted that "firearm rights have always been more limited" outside the home, based on a series of laws, dating from the nineteenth century and later, which targeted the carrying of *concealed* weapons. 638 F.3d at 470. These laws, according to the Fourth Circuit, evinced a "longstanding out-of-the-home/in-the-home distinction." *Id.* Not so. While these laws limited the carrying of *concealed* firearms—a practice that was considered dishonorable and especially dangerous by the social mores of the day—they did so against the background of *freely allowing* the *open* carrying of arms, thus "le[aving] ample opportunities for bearing arms." *Wrenn*, 864 F.3d at 662.

The fact that these laws left intact the background right to carry firearms in *some* manner was absolutely *critical* to most of the judicial opinions assessing their constitutionality. The distinction was relied upon by courts that upheld this type of law against constitutional challenge. *See State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view,' " and thus did not interfere with "the right guaranteed by the Constitution of the United States"); *Aymette v. State*, 21 Tenn. 154, 160–61 (1840); *State v. Reid*, 1 Ala. 612, 616–17 (1840). And it was also endorsed by the opinions *striking down* limitations on carrying firearms that cut too close to the core. *See Nunn*, 1 Ga. at 251 (limitation on "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," but "prohibition against bearing arms *openly*" was "in conflict with the Constitution, and *void*"); *see also Bliss*, 12 Ky. at 91–94.[3] These laws thus provide no historical pedigree for restrictions,

_____

[3] A few courts from this era upheld concealed carry bans without relying on this distinction, but they did so "on the basis of an interpretation of the Second Amendment . . . that conflicts with [*Heller*.]" *Kachalsky v. County of Westchester*, 701 F.3d 81, 91 n.14 (2d Cir. 2012). Those outlier decisions are thus "sapped of authority by *Heller*," and cannot be cited as reliable guides to the Second Amendment's scope. *Wrenn*, 864 F.3d at 658.

like Maryland's, which prohibit *both* open and concealed carrying and thus add up to "a denial of the right altogether." *Aymette*, 21 Tenn. at 161.

*Masciandaro* specifically cited the Georgia Supreme Court's decision in *Nunn*, but that case *refutes* the Fourth Circuit's analysis. *Masciandaro* cites *Nunn* for the proposition that "a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution." *Masciandaro*, 638 F.3d at 470–71 (quoting *Nunn*, 1 Ga. at 249). What the Fourth Circuit neglects to mention is that *Nunn struck down* the state law at issue in the case, reasoning that because it did not allow citizens to carry firearms *either concealed or openly* it "amount[ed] to a *destruction* of the right." *Nunn*, 1 Ga. 249. Indeed, the Supreme Court in *Heller* expressly noted that *Nunn* "struck down a ban on carrying pistols openly," citing it as an example of how a law that imposes a "severe restriction" on the right to keep and bear arms should be categorically "struck down." 554 U.S. at 612, 629.

Had the Fourth Circuit in *Woollard* or *Masciandaro* fairly engaged in the textual and historical analysis required by *Heller*, it would have reached the same conclusion as the two circuits that *have* treated seriously with the Second Amendment's text and history. *See Wrenn*, 864 F.3d at 661; *Moore*, 702 F.3d at 937, 942. For as shown above, these sources of authority leave no doubt that this constitutional guarantee extends outside the home. *See supra*, Part I.A. And because that is so, the right to *bear* arms "for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, can be no further from the heartland of the Second Amendment than the right to *keep* them.

16

II.     **Under *Heller*, Defendant's requirement that law-abiding citizens demonstrate a special need for self-defense to exercise their Second Amendment rights is categorically unconstitutional.**

Given that the core of the Second Amendment extends to armed self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements upon the Amendment's "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634. Defendant's prohibition is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

Defendant's demand that applicants provide "documented evidence of recent threats," Compl. Ex. 1 at 2, that sets them apart from the "average person," *Scherr*, 880 A.2d at 1148, *extinguishes* the core Second Amendment rights of *typical* citizens—who, by definition, cannot distinguish their need for self-defense from that of the general concern of "liv[ing] in a dangerous society," *id.* To be sure, Defendant's limits allow individuals to carry firearms if they can first

show that it is "necessary as a reasonable precaution for the applicant against apprehended danger." MD. CODE REGS. 29.03.02.03. But the Second Amendment does not set up a race between law-abiding citizens and their assailants to the license bureau. For those whose lives or safety are being threatened, it is cold comfort to know that they could have carried a firearm *if only they could have documented their "apprehended danger" in advance*. Surely under the Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—that scheme turns the right to bear arms on its head.

Indeed, the State's demand that a citizen prove to its satisfaction that he has a good enough reason to carry a handgun is flatly inconsistent with the very nature of the Second Amendment right. The existence of that right is itself reason enough for its exercise. It is thus no surprise that courts have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978) (government cannot condition speech on "a requirement that the speaker have a sufficiently great interest in the subject to justify communication"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (prior restraint presumptively unconstitutional); *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (government cannot "question the centrality" or "plausibility" of religious convictions); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

In short, as the D.C. Circuit persuasively concluded, a proper-cause-type requirement that limits the carrying of firearms outside the home to those with a "heightened need" for self-defense "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs." *Wrenn*, 864 F.3d at 666. Indeed, such a restriction "destroys the ordinarily situated

citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . , but by design: it looks precisely for needs 'distinguishable' from those of the community." *Id.* Such a prohibition is unconstitutional *per se.*

### III. *Woollard* was wrong to uphold Defendant's "good and substantial reason" restriction under intermediate scrutiny.

#### A. Strict scrutiny should apply.

Even if Defendant's restrictions were not *categorically* unconstitutional, they should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Woollard*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

#### B. Defendant's "good and substantial reason" restriction fails even intermediate scrutiny, properly applied.

Ultimately determining the correct standard of scrutiny is immaterial, however, because the "good and substantial reason" restriction should be struck down under *any* level of heightened scrutiny.

1. That is so, first, as a matter of law. By design, Defendant's restrictions will reduce firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of*

*Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Maryland has done here. Its restrictive licensing policies do not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, their purpose and effect is to *limit the number of arms borne in public*. As *Woollard* itself describes, to the extent "the good-and-substantial-reason requirement advances the objectives of protecting public safety and preventing crime" it is "because it reduces the number of handguns carried in public." 712 F.3d at 879. Limits like Defendant's "good and substantial reason" restriction thus "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other,

reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.      Even if these objections are set aside, the heightened need requirement still flunks intermediate scrutiny, and *Woollard* was still wrong to uphold it. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* As Judge Posner concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," that data does not provide "more than merely a rational basis for believing that [a ban on public carriage] is justified by an increase in public safety." *Moore*, 702 F.3d at 939, 942.

This is confirmed by experience. Forty-two States do not restrict the carrying of firearms to a privileged few. *See Gun Laws*, NRA-ILA, https://goo.gl/Nggx50. Yet "many years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. As social scientists who favor gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders . . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime—and that is the proposition Defendant must substantiate. That is confirmed by the determinations of both respected, public-interest

research organizations that have comprehensively looked at the issue: the National Research Council and the Centers for Disease Control. After exhaustively surveying every reputable study on the topic, the blue-ribbon NRC committee concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005). And the CDC's task force on the topic, after completing a similar exhaustive review, likewise concluded that the existing evidence simply does not establish that more permissive carry regimes "increases rates of unintended and intended injury in interpersonal confrontations." Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53–54 (2005).

    *Woollard*'s cursory discussion of whether Maryland's "good and substantial reason" requirement actually advances its public-safety justification fell far short of the court's duty "to assure that, in formulating its judgments, [Maryland] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994). The Fourth Circuit did little more than parrot Maryland's assertion that its restriction advances public safety by, for example, "[d]ecreasing the availability of handguns to criminals via theft," and "[c]urtailing the presence of handguns during routine police-citizen encounters." *Woollard*, 712 F.3d at 879–80. The Court did not analyze *any* empirical studies supporting these propositions, nor did it weigh (or even mention) the robust social-science evidence cited above *failing* to find any causal link between public safety and restrictions on carrying firearms outside the home. *Woollard*'s facile scrutiny of the "good and substantial reason" requirement was "heightened" in name only.

In an attempt to shore up the empirical support for its requirement, Defendant Pallozzi cites a handful of studies that, he says, "present additional compelling support for the Fourth Circuit's holding that there exists a 'reasonable fit' between Maryland's 'good and substantial reason' requirement and the governmental objectives of protecting public safety and preventing crime." Def.'s Mem in Supp. of Mot. to Dismiss at 5 (June 11, 2018), Doc. 12-1 ("MTD Br."). None of the cited studies comes close to filling the void left by *Woollard*.

Maryland's primary piece of evidence is an unpublished 2014 study by Abhey Aneja, John Donohue III, and Alexandria Zhang. But the 2014 Donohue study in fact *explicitly affirms* the NRC's judgment that the evidence is not sufficient to show *any causal link* between laws limiting public carrying of firearms and crime rates, and cautions that while such laws *might* decrease crime rates, any such conclusion *cannot be determined* "with the level of certainty one strives for in academic work." Abhay Aneja, John J. Donohue III, & Alexandria Zhang, The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy 80 (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H.

Maryland also cites a more recent study by Donohue, which it says "found that shall-issue laws increase violent crime and murder." MTD Br. 6 (citing John J. Donohue et al., Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data, the Lasso, and a State-Level Synthetic Controls Analysis (Nat'l Bureau of Econ. Res., Working Paper No. 23510, 2017) (unpublished manuscript) ("Donohue 2017")). But that finding is based on the study's use of the "synthetic control method," which compares crime rates in States that allow law-abiding citizens to carry firearms not with *real* States like Maryland that restrict public carry, but rather with *hypothetical* States that are constructed by combining bits and pieces of many different States. For instance, Donohue analyzes Texas by comparing its crime rates with "synthetic Texas," which is

made up of 57.7% of California, 9.7% of Nebraska, and 32.6% of Wisconsin. Donohue 2017 at 37. Similarly, "synthetic Pennsylvania" is constructed out of pieces of *eight different states*. *Id.* at 40. Because of the artificiality of such an analysis, even Donohue is forced to admit that "there will undoubtedly be a deviation from the 'true' counterfactual and our estimated counterfactual," *id.*, and that the method cannot show causation, since it may well be that increasing crime rates "lead[s] to . . . adoption" of a more permissive licensing regime, rather than the other way around, *id.* at 64.

Even taking the paper's model at face value, the results it produces fall short of redeeming Maryland's bold claims that its "good and substantial reason" restriction leads to an increase in public safety. For example, Donohue admits that eight states that moved to less-restrictive public carry regimes had *better* rates of violent crime than their "synthetic" comparators that (hypothetically) continued to limit carrying firearms in public. *Id.* at 44 fig.8. And he also admits that even under his synthetic method, the effect of loosening restrictions on public carry on murder rates was "less statistically significant" which "might seem to be at odds with our theoretical expectations, and in conflict with the estimated increases in overall violent crime." *Id.* at 61, 63.

The other studies cited by Defendant add little. One is merely a recapitulation of other research—on the issue of public carrying, principally the unpublished Aneja and Donohue study—and thus contributes nothing to the debate. Webster, et al., Firearms on College Campuses 15 (Oct. 15, 2016) (unpublished manuscript), *available at* https://goo.gl/RN6zec. Another concerns gun control measures *other* than restrictions on the right to carry—such as restrictions prohibiting "felons, persons who are subject to a restraining order for domestic violence, [or] individuals with serious mental illnesses" from possessing firearms—and thus does not even *purport* to address carrying outside the home. Daniel W. Webster & Garen J. Wintemute, *Effects of Policies Designed*

*to Keep Firearms from High-Risk Individuals*, 36 ANN. REV. PUB. HEALTH 21, 22 (2015), *available at* https://goo.gl/mULNvz. Defendant Pallozzi cites this study as concluding that "handgun permit and licensing laws are the type of firearm policy most consistently associated with curtailing the diversion of guns to criminals and for which some evidence indicates protective effects against gun violence." MTD Br. 6 (quotation marks and alteration omitted). But he surprisingly neglects to note that the "handgun permit and licensing laws" referred to by the cited study are permits to *purchase* handguns—making the statement utterly irrelevant in this case. Webster, *supra*, at 34. The remaining study—Michael Siegel, et. al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017)—does at least concern public carrying, but like the NRC and the Donohue study, it explicitly cautions that it does *not* find *any causal link* between more permissive carry regimes and violent crime. *See id.* at 1928.

The lack of evidence that these laws advance public safety should not be surprising, because violent criminals will continue to carry guns in public regardless. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing of] arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly

makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

See Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms*,*"* 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Instead of criminals, it is primarily the *law-abiding* who are affected by Defendant's restrictions. And that effect has very real public-safety *costs*—costs that Maryland entirely ignores. Although the number of defensive gun uses is difficult to measure, the leading study on the issue "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, *supra*, at 103. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193, 195 (1998). Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the "good and substantial reason" requirement cannot be shown to benefit public safety—but it may well harm it.

3.     Finally, even if Defendant's "good and substantial reason" restriction did advance public safety, it independently fails heightened scrutiny because it is not properly tailored to the government's asserted goals. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means." *McCullen v. Coakley*, 134 S.

Ct. 2518, 2534–35 (2014) (quotation marks omitted). Here, there is an utter lack of fit between Defendant's restrictions and their purported objective of public safety. After all, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." *Grace*, 187 F. Supp. 3d at 149. "This limitation will neither make it less likely that those who meet the [good reason] requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake v. Filko*, 724 F.3d 426, 454 (3d Cir. 2013) (Hardiman, J., dissenting).

## CONCLUSION

For the foregoing reasons, *Woollard* should be overruled by a court competent to do so.

Dated: June 25, 2018                     Respectfully submitted,

                                         s/ Nicole J. Moss
                                         Nicole J. Moss, Bar No. 20222
                                             *Attorney of Record*
                                         David H. Thompson*
                                         Peter A. Patterson*
                                         John D. Ohlendorf*
                                         COOPER & KIRK, PLLC
                                         1523 New Hampshire Avenue, N.W.
                                         Washington, D.C. 20036
                                         (202) 220-9600
                                         (202) 220-9601 (fax)
                                         nmoss@cooperkirk.com

                                             *Appearing *pro hac vice*

                                         *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy of the document to be served electronically on all parties or their counsel.


Dated: June 25, 2018                                         s/ Nicole J. Moss
                                                            Nicole J. Moss

                                                            *Attorney for Plaintiffs*